

# Fourth Court of Appeals

## San Antonio, Texas

## OPINION

No. 04-15-00318-CV

**GEMINI INSURANCE COMPANY** and
Berkley Oil & Gas Specialty Services, LLC,
Appellants

v.

**DRILLING RISK MANAGEMENT, INC.**,
Appellee

From the 216th Judicial District Court, Kendall County, Texas
Trial Court No. 12-066
Honorable Bill R. Palmer, Judge Presiding

Opinion by:  Rebeca C. Martinez, Justice

Sitting:  Karen Angelini, Justice
Rebeca C. Martinez, Justice
Patricia O. Alvarez, Justice

Delivered and Filed:  July 6, 2016

REVERSED AND RENDERED

This appeal concerns insurance coverage for re-drilling expenses under a Control of Well policy issued by Gemini Insurance Company and underwritten by Berkley Oil & Gas Specialty Services, LLC (collectively, "Gemini" unless otherwise stated).  Drilling Risk Management, Inc. ("DRMI") sought coverage under the policy after it experienced two underground blowouts in the well it was drilling.  After Gemini partially denied DRMI's claim, DRMI filed suit.  The trial court granted summary judgment in favor of the insured, DRMI, on the coverage and deductible issues. DRMI's remaining claims for deceptive acts and practices in violation of the Insurance Code were

tried to a jury which found in favor of DRMI. Gemini appeals the trial court's final judgment, arguing that under the plain language of the policy the cost of certain redrilling materials is not covered and each blowout constituted a separate occurrence warranting separate deductibles, and that the trial evidence does not support the jury's finding of deceptive acts or practices or its assessment of damages and attorney's fees.

We reverse the summary judgments in favor of DRMI on the issues of coverage and the two deductibles, and we render judgment in favor of Gemini as a matter of law on those issues. Based on our disposition of the issues concerning the policy, we need not address the jury's findings of deceptive acts and practices and the award of damages and attorney's fees. Accordingly, we render a take-nothing judgment against DRMI.

### FACTUAL AND PROCEDURAL BACKGROUND

DRMI is an oilfield drilling contractor that was hired to drill a well to a total depth of 13,738 feet in shallow waters off the Louisiana coast for a fixed price under a turnkey drilling contract. DRMI is an additional named insured on a Control of Well insurance policy (the "Policy") purchased by Fort Apache Energy, Inc. The Policy was purchased from Gemini, but issued through J.H. Blades & Co., Inc. The Policy covers "well out of control" events such as blowouts and redrilling efforts necessary to control the well and restore it to a comparable pre-blowout condition.

The following facts are the relevant facts as developed by the competing summary judgment motions. After approximately two weeks of drilling, DRMI experienced the first problem when it encountered an unexpected weak pressure zone, or depleted zone, in the Planulina B Sand at a depth of 6,906 feet. The weak zone resulted in full losses and caused DRMI to revise its casing plan. The original drilling plan called for DRMI to set 9 5/8 inch casing ("the Casing") in the hole at a depth of 10,200 feet. After encountering the weak zone at 6,906 feet, DRMI revised

its drilling plan with respect to where to set the Casing—its intent was to drill past the Planulina B Sand and set the Casing at a depth of 9,750 feet. However, before it reached the planned depth for setting the Casing, DRMI drilled into an unexpected high pressure zone at 9,674 feet, which caused the well to "kick," resulting in uncontrolled subsurface flow between the kick zone and the weak zone. This underground blowout on November 3, 2011 was the first "Well Out of Control" event ("Blowout #1"). Despite its efforts to control the subsurface flow, DRMI had to plug the hole at the Blowout #1 depth of 9,674 feet. No Casing was ever set in the original wellbore.

DRMI again revised its drilling plan and began drilling a "sidetrack" well at a shallow depth off of the initial wellbore ("Sidetrack #1"). In drilling Sidetrack #1, DRMI set the Casing at a depth of 9,570 feet in order to isolate the high and low pressure zones that had caused Blowout #1. DRMI successfully reached the depth of the initial blowout (9,674 feet) and continued drilling below it. However, on December 5, 2011, DRMI drilled into another unexpected weak zone at 10,304 feet, followed by a high pressure kick zone at 10,917 feet, which caused uncontrolled subsurface flow and resulted in a second underground blowout ("Blowout #2"). DRMI was forced to plug the sidetrack well.

In order to avoid the cost of drilling a new well, DRMI initiated a second sidetrack well at 10,320 feet, but it was unsuccessful due to unexpected pressure zones and uncontrolled flow; the drilling never reached the depth of Blowout #2. DRMI then began drilling a third sidetrack well ("Sidetrack #3") at a shallower depth of 9,952 feet. Before Sidetrack #3 reached the 10,917-foot depth of Blowout #2, DRMI installed a 7 inch liner (the "Liner") at a depth of 10,854 feet to isolate the high and low pressure zones that caused the second blowout. DRMI successfully completed Sidetrack #3 to total depth.

DRMI made a claim on the Policy after each blowout. Berkley, the underwriting manager for Gemini, assigned BC Johnson & Associates to investigate and adjust the claims. Berkley hired

David Watson, an independent petroleum engineer, to evaluate DRMI's claims, including whether the blowouts met the Policy's definition of an "Occurrence," whether DRMI acted with due diligence, and whether the casing and liner costs were necessary as a result of the blowouts or due to pre-existing geological conditions. Berkley determined that each blowout constituted a separate "Occurrence" under the Policy's terms and a $250,000 deductible was assessed on each claim. Berkley concluded that each blowout met the "Well Out of Control" definition in Section IA of the Policy and triggered the Section IB redrill coverage. Berkley also concluded that DRMI had acted as a prudent and diligent driller. Gemini reimbursed DRMI under Section IA for approximately $4.5 million in covered expenses incurred in bringing the two blowouts under control. Gemini also reimbursed DRMI under Section IB for approximately $3 million in covered redrilling expenses incurred in drilling the sidetrack wells.

On January 19, 2012, Berkley sent DRMI a "Partial Denial of Coverage" letter declining to reimburse DRMI for other redrilling expenses it concluded were not caused by the blowouts. Specifically, the letter stated, "there does not appear to be coverage for costs associated with the 9 5/8 inch casing used in the first sidetrack and relating to the first Occurrence. Likewise, there does not appear to be coverage for the 7 inch liner used in the third sidetrack and relating to the second Occurrence." The letter explained that coverage for these costs was denied "based on the terms and conditions of the Policy, the information DRMI has provided to date, the adjustment by BC Johnson [&] Associates to date, and the opinion of petroleum engineer David Watson," which was attached to the letter. The letter summarized Watson's investigation and findings that (1) the 9 5/8 inch casing was required to be set shallow at 9,570 feet "as a result of pre-existing hole conditions," defined as the previously unknown loss and kick zones, "and not as a result of the well control incident — the Occurrence," and (2) the 7 inch liner was "necessary as a result of pre-existing hole conditions," defined as the previously unknown loss and kick zones, "and not because of damage

to the Well as a result of the second Occurrence." The value of the denied claim was approximately $1.7 million.

DRMI filed suit alleging breach of contract against Gemini for "improperly denying covered claims" under the Policy, and seeking a declaratory judgment on DRMI's construction of the Policy, specifically, that Gemini had a duty to indemnify it for the costs of "running 9 5/8" casing, a 7" liner, extra drilling time, pro-rated logging, and the amount of the second deductible unlawfully withheld." DRMI also alleged that Gemini breached its common law duty of good faith and fair dealing by denying coverage without a reasonable basis, conducting a pretextual investigation, and misrepresenting the Policy terms in its denial letter, and that both Gemini and Berkley violated the Insurance Code by knowingly engaging in unfair settlement practices and failing to promptly pay a covered claim. *See* TEX. INS. CODE ANN. §§ 541.060, 541.152(b) (West 2009); *id.* § 542.060 (West 2009 & Supp. 2015). DRMI sought to recover its actual damages (i.e., the cost of the Casing and Liner, and associated logging and extra drilling time), the improperly withheld second deductible, lost profits as a result of Gemini's and Berkley's conduct, treble damages for the Chapter 541 violation, statutory penalty interest for the Chapter 542 violation, and attorney's fees.

The parties filed competing summary judgment motions on the various claims. On June 23, 2014, the trial court signed a general order granting DRMI's partial summary judgment motion on its construction of the Policy language, and denying Berkley's summary judgment motions on the same issue as well as the other DRMI claims. On September 15, 2014, the trial court granted partial summary judgment in favor of DRMI on its claim for recovery of the second deductible withheld by Gemini. The trial court having resolved the issues of coverage and the second deductible in DRMI's favor as a matter of law, a jury trial was held on the remaining claims

asserted by DRMI, i.e., common law bad faith and Insurance Code violations.[1]  At the conclusion of trial, the jury found in favor of DRMI on the statutory violations and found that Gemini's and Berkley's conduct was "knowing."  On November 17, 2014, the trial court signed a final judgment incorporating the prior summary judgment orders and the jury's verdict.  The court awarded DRMI (i) stipulated actual damages totaling $1,942,440, consisting of the costs of the Casing ($1,024,415), the Liner ($597,627), and the associated logging ($70,398), and recovery of the second deductible ($250,000); (ii) past lost profits of $1,500,000; (iii) additional damages of $4,000,000 for "knowing" conduct under Chapter 541 of the Insurance Code; (iv) $1,093,619 in penalty interest Chapter 542 of the Insurance Code; and (v) attorney's fees for trial ($929,015) and appeal ($165,000).

Gemini appeals, arguing the trial court erred in granting summary judgment in favor of DRMI on the coverage issue because the cost of the Casing and Liner, and associated logging, was not "caused by an Occurrence," and thus is not a covered loss, under the plain language of the Policy.  Gemini also argues the trial court erred in concluding the two blowouts were a single "Occurrence" subject to a single deductible because the blowouts happened at different depths and one month apart.  Gemini also challenges the jury's findings that it knowingly engaged in unfair or deceptive acts and practices, and the awards of damages and attorney's fees.

SUMMARY JUDGMENT — CONSTRUCTION OF THE POLICY

### Standard of Review

We review a trial court's grant or denial of summary judgment *de novo*.  *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003).  To prevail on a traditional motion for summary judgment, the moving party must prove that "there is no genuine issue as to any

---

[1] DRMI pursued its common law bad faith claim through trial but dropped it before the jury charge was submitted. Therefore, the jury considered only the alleged Insurance Code violations.

material fact and the moving party is entitled to judgment as a matter of law on the issues expressly set out in the motion." TEX. R. CIV. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co. Inc.*, 690 S.W.2d 546, 548 (Tex. 1985). When there are competing summary judgment motions on the same issues, and the trial court grants one and denies the other, we consider the summary judgment evidence presented by both sides and determine all questions presented, and, if we determine the trial court erred, we render the judgment the trial court should have rendered. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). When the trial court does not specify the grounds on which the summary judgment was granted, we must affirm if any of the summary judgment grounds are meritorious. *Knott*, 128 S.W.3d at 216.

### *The Policy Language*

The Policy contains two types of coverage, "Control of Well" and "Redrill/Extra Expense." Section IA provides the coverage for expenses incurred in bringing a well under control after a blowout and ends when the well is under control or plugged. As noted, Gemini paid DRMI for its well control costs incurred under this provision, but assessed separate deductibles for each Occurrence. The Policy defines the term "Occurrence" as "one loss, disaster or casualty or series of losses, disasters or casualties arising out of one event." The relevant language of Section IA is quoted below.

SECTION IA
CONTROL OF WELL INSURANCE

1. COVERAGE:

The Company [Gemini] agrees, subject to the . . . terms and conditions of this Policy, to reimburse the Assured [DRMI] for actual costs and/or expenses incurred by the Assured [DRMI] (a) in regaining or attempting to regain control of any and all Wells Insured which get out of control, including any other Well that gets out of control as a direct result of a Well Insured getting out of control, but only such costs and/or expenses incurred until the Well is brought under control as defined in Paragraph 2b of this Section IA . . . .

2. <u>DEFINITIONS</u>:

   a. <u>Well Out of Control</u>:

For the purposes of this insurance, a Well shall be deemed to be out of control only when there is an unintended flow of drilling fluid, oil, gas or water above the surface of the ground, or water bottom in case of a Well located in water, or when there is an unintended subsurface flow of oil, gas, water and/or fluid from one subsurface zone to another subsurface zone via the bore of the Well, which cannot be controlled by the blowout preventer . . . or stopped by increasing the weight by volume of drilling fluid or by the use of other conditioning materials in the Well…

   b. <u>Well Brought under Control</u>:

For purposes of this insurance a Well deemed out of control in accordance with Paragraph 2a of this Section IA shall be deemed to be brought under control at the time that the flow giving rise to a claim hereunder stops, or is stopped and:

   (1) the drilling, deepening, lengthening, Side Tracking or Working Over/ recompleting/ re-entering, or other similar operation taking place in the Well immediately prior to the Occurrence giving rise to a claim hereunder is resumed or can be resumed; or

   (2) the Well is or can be returned to the same producing, shut-in or other similar status that existed immediately prior to the Occurrence giving rise to a claim hereunder; or

   (3) when the Well is permanently plugged and abandoned . . .

whichever shall first occur . . . .

\*\*\*

3. <u>TERMINATION OF EXPENSES</u>:

In any circumstances . . . the Company's liability for costs and/or expenses incurred in regaining or attempting to regain control of a Well shall cease when the Well is brought under control as defined in Paragraph 2b of this Section IA.

Section IB of the Policy provides additional coverage for expenses incurred to redrill or restore the well, or any part of the well, lost or damaged as a result of an Occurrence under Section IA. The Section IB coverage ends when redrilling reaches the depth at which the well became out of control and the well is restored to a condition comparable to its pre-blowout condition. As

noted, Gemini partially denied coverage for redrilling expenses claimed under Section IB. The relevant provisions of Section IB are quoted below.

SECTION IB
REDRILL/EXTRA EXPENSE

1. COVERAGE:

The Company [Gemini] agrees, subject to . . . the terms and conditions of this Policy, to reimburse the Assured [DRMI] for actual costs and/or expenses reasonably incurred to restore or redrill a Well, or any part thereof, which has been lost or otherwise damaged as a result of crater or an Occurrence giving rise to a claim which would be recoverable under Section IA of this Policy . . . subject to the following conditions:

***

c. In no event shall the Company be liable for cost and/or expenses incurred (a) with respect to drilling, deepening, lengthening or Side Track Wells, to drill beyond the length reached when the Well became Out of Control as defined in Clause 2 of Section IA of this Policy . . . .

d. In any circumstances, the Company's liability under this Section IB for costs and/or expenses shall cease in any event when the length set forth in Paragraph 1c of this Section IB has been reached and the Well restored to a condition comparable to that existing prior to the Occurrence giving rise to the claim, or so far as possible . . . .

e. In the event the restoration or redrill Well becomes a Well Out of Control, it shall be considered a continuation of the original Occurrence.

The Policy does not define the terms "restoration well" or "redrill well," but does define the term "Well" as "a hole bored into the earth with the intention of discovering . . . oil and/or gas . . . including such . . . casing, liner and/or tubing as may be installed therein and such Wellhead Equipment as may be installed immediately above the hole." The Policy also defines the term "Side Track" as "an operation involving the use of a portion of an existing Well to drill a new Well." The Policy provides a "Retention/Deductible" of $250,000 per "any one Occurrence." The loss or series of losses arising out of one "Well Out of Control" event constitutes an "Occurrence."

The Policy limit is $30 million per Occurrence for Wells located in Wet areas (defined in the Policy).

### *Applicable Law*

An insurance policy is construed according to the same rules of construction applied to contracts generally. *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 118 (Tex. 2015). Courts focus on the plain language of the policy and give the words and phrases their ordinary and generally accepted meaning, unless otherwise specified. *Id.* The words and phrases are read in context of the policy as a whole, giving effect to all of the words and provisions so none is rendered meaningless. *Id.*; *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex. 1994) (no provision should be isolated and considered apart from the other provisions). Language that can be given a certain or definite meaning is not ambiguous, and is construed as a matter of law. *Chrysler Ins. Co. v. Greenspoint Dodge of Houston, Inc.*, 297 S.W.3d 248, 252 (Tex. 2009); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). Insurance policy terms are not ambiguous simply because they are undefined; they are given their ordinary meaning. *Gilbert Tex. Const., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010). A contract is ambiguous only if, after applying the rules of construction, it remains "subject to two or more reasonable interpretations." *Lynd*, 466 S.W.3d at 119. Where ambiguity exists, insurance policies are analyzed with a presumption in favor of coverage, i.e., in favor of the insured. *Id.* at 118-19 (recognizing the unequal bargaining power between the insured and the insurer). The presumption in favor of coverage in construing an ambiguous policy provision applies only if the insured's interpretation is reasonable. *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 (Tex. 1998). A mere disagreement over interpretation of a policy's language or coverage does not render the contract ambiguous. *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003).

***Summary Judgment Motions and Evidence***

In their competing summary judgment motions, Gemini and DRMI each argued that their interpretation with respect to coverage of the disputed redrill expenses and the propriety of a second deductible is the only reasonable interpretation based on the plain, unambiguous language of the Policy. Neither party asserts the Policy is ambiguous.[2]

1. ***Section IB Redrill Coverage for the Casing and Liner***

In its summary judgment motion on the disputed coverage issue, which the trial court denied, Gemini asserted that, under the plain unambiguous language of the Policy, the expenses for the Casing used in Sidetrack #1 and the Liner used in Sidetrack #3 were not covered because DRMI would have incurred those costs in any event due to the pre-existing geologic zones and regardless of any blowout; thus, the costs were not incurred "as a result of" an Occurrence. Gemini's argument is based on the language in the first sentence of Section IB which defines the scope of the redrill coverage as reimbursement for "actual costs and/or expenses reasonably *incurred* to . . . redrill a Well, or any part thereof, which has been lost or otherwise damaged *as a result of* . . . an Occurrence giving rise to a claim . . . recoverable under Section IA . . . ." (emphasis added). In essence, Gemini's position is that Section IB covers only redrill expenses that are incurred because of an Occurrence, i.e., a Well Out of Control event or blowout.[3] As an additional ground, Gemini noted the Policy is a "named peril" indemnity contract, not an all-risk insurance contract, and asserted that reimbursement for the Casing and Liner would put DRMI in a better position than it would have been if the blowouts never occurred.

---

[2] On appeal, DRMI argues that if this court determines both parties' interpretations are equally reasonable and concludes the Policy is therefore ambiguous, then the presumption in favor of an insured on the issue of coverage applies and its "reasonable" interpretation prevails. *Lynd*, 466 S.W.3d at 118-19.

[3] The parties use "Occurrence" and "blowout" interchangeably in their briefs, even though the Policy's definition of "Occurrence" technically refers to the loss(es) arising from the Well Out of Control event, rather than the event itself. At oral argument, the parties agreed that the two terms mean essentially the same thing in the context of this dispute.

In support of its interpretation of the scope of the redrill coverage, Gemini relied on the Policy language as well as summary judgment evidence showing that DRMI would have incurred the Casing and Liner expenses in order to reach total depth, even without any blowout, due to the unexpected pressure zones it encountered during drilling. Gemini submitted the following summary judgment evidence in support of its motion: (1) the affidavit of Steve Morton, Senior Claims Specialist for Berkley; (2) DRMI's responses to requests for disclosure; (3) DRMI's second amended petition; (4) excerpts from the deposition of Allan Bloxsom, DRMI's President; (5) excerpts from the deposition of George Brazzel, a principle with DRMI; (6) Fort Apache's responses to first requests for admission; (7) the affidavit of Robert Kachnik, the BC Johnson adjuster; and (8) the Policy.

In its summary judgment motion, granted by the trial court, DRMI asserted that the plain language of the same sentence in Section IB means the Policy covers the "actual costs and/or expenses reasonably incurred to . . . *redrill a Well*, or any part thereof, which has been *lost* . . . as a result of an Occurrence . . . ." (emphasis added). DRMI's argument stresses that the phrase "lost as a result of" modifies the term "Well," which the Policy defines as including not only the bore hole, but also casing and liner. In essence, DRMI's position is that Section IB covers all reasonable expenses incurred to redrill a Well after an Occurrence, i.e., a blowout. DRMI also asserted that the Policy does not use or define the term "preexisting hole conditions," and contains no exclusion for "pre-existing hole conditions" or for "betterments or improvements." Therefore, DRMI asserted Gemini could not deny coverage for the Casing and Liner expenses based on terms not contained in the Policy.

In support of its interpretation of the redrill coverage, Gemini relied on the Policy language and the absence of the above-referenced exclusions, as well as summary judgment evidence showing that Berkley (through Steve Morton) agreed that the well was damaged "as a result of"

the two blowouts and that the Casing and Liner expenses were "reasonably incurred." DRMI attached the following summary judgment evidence to its motion: (1) Berkley's "Partial Denial of Coverage" letter and David Watson's report; (2) the deposition of Steve Morton; (3) a timeline of the relevant drilling events prepared by BC Johnson after its investigation; (4) the Policy; and (5) excerpts from the deposition of Robert Kachnik, the adjuster for BC Johnson.

*Summary Judgment Evidence*. Turning to the parties' summary judgment evidence, we begin with the report conducted by the petroleum engineer David Watson and attached to Berkley's Partial Denial Letter. Watson states in the report that he was hired by Berkley, in part, to "determine if the modified casing program was [the] result of the underground blowout(s) or if the changes were dictated by the natural geological and pressure conditions present before the well was drilled." Based on his investigation, Watson concluded that "[p]reexisting hole conditions, not Event #1, caused the intermediate casing to be set shallow in the sidetrack hole," and, similarly, that "[p]reexisting hole conditions, not Event #2, caused the need for the 7-inch liner to be set at 10,854 feet." Watson's report states that Allan Bloxsom, DRMI's President, told him that, based on its research, DRMI believed its wellbore was separated by a fault from potential depleted zones in the area. Watson's report includes a diagram (Figure 2) comparing DRMI's original drilling plan to the actual drilling program it used to complete the well. Figure 2 shows DRMI originally planned to set 9 5/8-inch casing in the original wellbore at 10,200 feet and install a 5 1/2–inch liner at 13,500 feet near total depth. Instead, DRMI ended up having to set the 9 5/8-inch casing (the Casing) at a shallower depth of 9,570 feet in a sidetrack well (Sidetrack #1) and to use an unplanned 7-inch liner (the Liner) in Sidetrack #3 in order to reach total depth. Brazzel, a DRMI principle, confirmed in his deposition that DRMI's original well plan called for setting 9 5/8-inch casing in the original hole at a shallower depth than the depth where it was actually set; he conceded that prudent drilling practice is to drill based on actual conditions encountered and

adjustments must be made during drilling. In discovery, Fort Apache admitted that 9 5/8-inch casing had been ordered and was on the dock, but had not yet been purchased, before the date of Blowout #1 in the original hole. Watson's report states the weak zone DRMI drilled into at 6,906 feet in the original hole "effectively voided the original casing program as a viable plan for reaching total depth." Watson further states that Bloxsom told him that "DRMI recognized at the time intermediate casing could not be set at the depth originally planned and their intent was to drill past the Planulina B Sand and set casing at . . . 9,750 feet." However, Blowout #1 occurred at 9,674 feet before the Casing was set.

In the drilling of Sidetrack #1, Watson's report states that setting the Casing shallower (at 9,570 feet) than intended (at 9,750 feet) "was necessary at this depth to isolate the weak zone at 6,900 feet from the zone that kicked in the original hole. The revised hole program was not caused by the well control event in the original hole but was rather dictated by the preexisting conditions that were encountered during the drilling process." Berkley's Steve Morton stated in his deposition that the need to set casing higher up in the hole to isolate those zones preexisted the blowout. Brazzel also testified that the Casing was set at the shallower depth in order to isolate the depleted zone from the kick zone that caused Blowout #1.

Brazzel further testified that Blowout #2 occurred in Sidetrack #1 after DRMI drilled into unexpected weak sandstone creating a loss zone at 10,304 feet and the well kicked at 10,917 feet, resulting in uncontrolled subsurface flow. Brazzel was asked in his deposition, "So at this point in time you know if you are going to get to TD [total depth], you are going to have to run a seven-inch liner, right?" Brazzel answered, "Yes." Brazzel also agreed that the reason for running a seven-inch liner was "these preexisting hole conditions . . . that existed before you started drilling the well." Watson's report states that "Allan Bloxsom expected shale to be the predominant lithology to the next casing point at approximately 11,700 feet and the weak sandstone at 10,304

feet was a surprise. DRMI now recognized that another liner would be required and Mr. Bloxsom told me their intent was to push the . . . hole to approximately 11,000 feet. . . However the well kicked at 10,917 feet . . . the kick also came as a surprise."

Finally, Watson's report states that, after Blowout #2, DRMI initiated a second sidetrack well and planned to "drill an 8 ½ inch hole to a depth shallower than the [Blowout #2] kick zone and set a 7-inch drilling liner." However, the second sidetrack well failed because it experienced subsurface flow before drilling reached the sand at 10,917 feet, the depth of Blowout #2. DRMI then began drilling Sidetrack #3 at a depth of 9,952 feet. Casing was set at 10,854 feet and DRMI was "rigging up to run the 7-inch liner when the well again flowed with pipe out of the hole." DRMI suffered some loses but was able to regain control and installed the 7-inch liner at 10,854 feet. Watson concludes in his report, "The 7-inch drilling liner was necessary to isolate the sand at 10,304 feet from the zone that kicked in Sidetrack #1 and the additional casing was not caused by the well control event in Sidetrack #1 but was rather dictated by the preexisting conditions encountered during the drilling process."

*Analysis.* Gemini argues on appeal that this uncontroverted evidence establishes that the Casing and Liner expenses were not incurred "as a result of" the blowouts, i.e., the Occurrences, and thus according to the plain language of the Policy are not covered redrill expenses. We agree. The summary judgment evidence shows that DRMI had to modify its drilling plan several times as it encountered unexpected, preexisting pressure zones — the modifications (including use of the Casing and Liner) were not caused by the two blowouts. DRMI presented no evidence that it was the blowouts themselves that created the need for the Casing and Liner. Indeed, DRMI's own principles, Brazzel and Bloxsom, agreed that preexisting geological conditions caused the casing and liner plans to be modified. In addition, the evidence shows that, before the first blowout, DRMI knew it needed to use 9 5/8-inch intermediate casing in the hole in

order to drill the well because of the natural geological features it planned to drill through; it had that size casing on hand. Based on the detailed information set forth in his report and summarized above, Watson's report concluded that "preexisting hole conditions," not Blowout #1, caused the Casing to be set shallow in Sidetrack #1, and "preexisting hole conditions," not Blowout #2, caused the Liner to be set in Sidetrack #3. DRMI presented no summary judgment evidence to the contrary. The evidence shows that, regardless of whether a blowout occurred or not, DRMI would have had to incur the Casing and Liner expenses in order to complete the well. Applying the undisputed facts to the Policy's plain language, the Casing and Liner costs were not incurred "as a result of" an Occurrence, and therefore those costs do not fall within the scope of Section IB.

DRMI's interpretation of the scope of Section IB focuses on the phrase "redrill a Well" and the definition of "Well" as encompassing casing and liner. In DRMI's reading of the coverage language, once a Well has been lost or damaged as a result of an Occurrence, all costs and expenses reasonably incurred to redrill the Well are covered under the Policy. DRMI contends the undefined terms redrill well and restoration well "plainly mean the entire well after restoration or redrill operations have begun (regardless of depth)." Referring to the definition of an "Occurrence," DRMI argues the "loss" is the loss of a functioning well and the money it expended on the well. Under DRMI's interpretation, all reasonably incurred redrilling expenses undertaken after a well suffers a blowout are "incurred as a result of" the blowout. This broad interpretation of the scope of coverage ignores the restrictions provided in subsections 1c and 1d of Section IB and renders them meaningless. *See Lynd*, 466 S.W.3d at 118 (words and phrases must be read in the context of the policy as a whole, and so that no provisions are rendered meaningless). As quoted, *supra*, subsection 1d states that "in any circumstances," Gemini's redrill liability ceases when drilling reaches the depth of the blowout and the well is restored to a condition comparable to that existing before the blowout. DRMI asserts that restoration to a comparable condition means a "functional

well." However, DRMI did not yet have a "functional well" at the time of Blowout #1 or Blowout #2. Further, subsection 1c states that, "in no event," shall Gemini be liable for costs incurred to drill a Side Track Well beyond the depth reached when the Well became Out of Control. A "Side Track Well" is defined as a "new Well" drilled by using a portion of an existing Well. The evidence shows that Gemini reimbursed DRMI for approximately $3 million in costs incurred in drilling the sidetrack wells as "losses resulting from the blowouts," but determined the Casing and Liner expenses did not result from the blowouts. We agree with Gemini that DRMI's interpretation of the scope of Section IB's redrill coverage is unreasonable because it "attempts to transform coverage for losses caused by a blowout into coverage for expenses incurred after a blowout."

The trial court's summary judgment in favor of DRMI could also have been based on DRMI's summary judgment ground that Berkley's denial of coverage for the Casing and Liner was outside the Policy terms, i.e., that the Policy did not contain a definition of or exclusion for "preexisting hole conditions" or "betterments or improvements." Berkley's use of the term "preexisting hole conditions" in its Partial Denial Letter was drawn from Watson's report which is attached to the letter. The first page of his report describing his assignment makes clear that Watson used the term to mean "the natural geological and pressure conditions present before the well was drilled." Thus, the term is not mysterious or incapable of comprehension in the context of this dispute, as DRMI suggests. Indeed, Brazzel and Bloxsom acknowledged that preexisting geological conditions caused the casing and liner plans to be modified. The "preexisting hole conditions" is simply the reason the claimed Casing and Liner costs did not fall within the scope of the redrill coverage. As Gemini notes, the Policy is a contract of indemnity whose scope is limited to that expressly set forth in the insurance agreement. *See State Farm Fire & Cas. Co. v. Griffin*, 888 S.W.2d 150, 156 (Tex. App.—Houston [1st Dist.] 1994, no writ). If the claimed expenses do not fall within the scope of the Policy, then they are not covered; a specific exclusion

is not necessary. An insured bears the burden to establish that its claim falls within the scope of coverage provided by the insurance agreement. *Employers Cas. Co. v. Block*, 744 S.W.2d 940, 945 (Tex. 1988). As discussed above, DRMI failed to prove that the Casing and Liner expenses fall within the scope of Section IB coverage.

The same logic applies to DRMI's argument that the Policy could have contained, but did not contain, an "improvements or "betterments" exclusion. As noted, Gemini argued in its summary judgment motion that its liability was limited to the "named peril" set forth in the Policy, and if it paid for the Casing and Liner, DRMI would be put in a better position than if the two blowouts never occurred, i.e., amounting to an improvement or betterment beyond the "comparable condition" restriction stated in 1d of Section IB. Thus, under the plain language of the Policy, Gemini's obligation was limited to restoring the well to a condition comparable to that existing before the blowout. A specific exclusion for an improved condition was not required.

Based on the foregoing analysis, we conclude that DRMI's broad interpretation of the coverage language in Section IB is not reasonable, and that its argument that the referenced specific exclusions were necessary also fails. We therefore hold that summary judgment in favor of DRMI on the coverage issue was improper on either ground.[4] We conclude that, as a matter of law, the only reasonable interpretation of the Section IB coverage language is that its scope is limited to redrill expenses incurred because of an Occurrence, i.e., a Well Out of Control event, as asserted by Gemini. *See Evergreen Nat'l Indem. Co. v. Tan It All, Inc.*, 111 S.W.3d 669, 675 (Tex. App.—

---

[4] DRMI argues that even if the trial court's decision to grant summary judgment in its favor on coverage was erroneous, the error was rendered harmless by evidence presented during the trial on its deceptive acts and practices claim. *See Progressive Cnty. Mut. Ins. Co. v. Boyd*, 177 S.W.3d 919, 921 (Tex. 2005) (holding that any error in granting partial summary judgment was rendered harmless when subsequent jury finding negated recovery on dismissed claim); *see also DeNucci v. Matthews*, 463 S.W.3d 200, 207-08 (Tex. App.—Austin 2015, no pet.) (holding that trial evidence on breach of fiduciary duty claims based on the same set of facts as the fraud claim dismissed on no-evidence summary judgment rendered any error in dismissing the fraud claim harmless). That line of cases is distinguishable. The present case does not involve dismissal of a claim on summary judgment, but rather a grant of relief in DRMI's favor.

Austin 2003, no pet.) (construction of an insurance policy is a legal issue for the court to determine).

### 2. *Second Deductible*

The parties also filed competing summary judgment motions on the issue of whether a second deductible for Blowout #2 was appropriate under the Policy. The trial court granted DRMI's summary judgment on the issue.

In support of its assertion that the blowouts were two separate Occurrences warranting two deductibles, Gemini relied on the Policy's definition of an "Occurrence" as a loss or series of losses arising out of "one event." Gemini stressed the undisputed facts that the two separate blowouts occurred at different depths and one month apart, and asserted they constituted two separate "events." Gemini also stressed the fact that the second blowout occurred after Sidetrack #1 had reached the 9,674-foot depth of the first blowout, and drilling had continued beyond that point to approximately 1,000 feet deeper before the second blowout happened. Gemini thus asserted that, pursuant to 1c and 1d, Section IB restoration coverage for the first blowout had terminated before Blowout #2 occurred. Gemini attached summary judgment evidence consisting of the Policy, Morton's affidavit, discovery responses by DRMI and Fort Apache, the proof of loss submitted by DRMI, and a report by John Meloy, an insurance underwriter.

In its motion contending assessment of a second deductible was improper under the Policy, DRMI asserted the two blowouts were part of the same "Occurrence." DRMI relied on subsection 1e of Section IB which states that if a redrill well becomes a Well Out of Control, it is considered a "continuation of the original Occurrence." DRMI again relied on the Policy's definition of a "Well" as the hole and the casing and liner, and asserted that a redrill well or restoration well "plainly means the entire well after restoration or redrill operations have begun (regardless of depth)." Because the second blowout occurred in the same "entire hole" created when DRMI

originally began drilling, it contended it was part of, or a "continuation" of, the same event or "Occurrence" according to subsection 1e. DRMI relied on Bloxsom's affidavit, as well as affidavits by DRMI's Chief Financial Officer Matthew Milligan, and Leo Munoz, a CPA expert, plus the depositions of Morton, Kachnik, Meloy, and Jeffrey Hughes, a petroleum engineering expert, and the status updates by Kachnik. As noted, the trial court agreed with DRMI and granted its motion for summary judgment on this issue.

However, DRMI's interpretation of the Policy relies on reading subsection 1e in isolation, not in context with the limitation of liability provisions in subsections 1c and 1d. As noted above, when read together subsections 1c and 1d state that coverage under the Policy ends when redrilling reaches the depth of the blowout and the well is restored to a condition comparable to its condition prior to the blowout. DRMI points out that there is no cross-reference between subsections 1c, 1d, and 1e. DRMI argues the Policy could have been written to make the "continuation" language in section 1e "subject to" the cessation of liability provisions of sections 1c and 1d, but it was not drafted that way. However, we must read all three subsections together and harmonize their provisions in order to give full meaning to the Policy language. *See Lynd*, 466 S.W.3d at 118. Reading the three subsections together within the context of the entire Policy, once Sidetrack #1 reached the length/depth at which the well initially became out of control (subsection 1c) and the well was restored to a comparable pre-blowout condition (subsection 1d), then the Section IB redrill coverage terminated; as drilling continued below that point, the sidetrack well was no longer a "restoration or redrill Well" under the Policy. Therefore, the "continuation" provision of subsection 1e did not apply to the second blowout, which occurred 1,000 feet below the depth of Blowout #1. Because the two blowouts constituted two separate events or Occurrences, separate deductibles were required under the Policy. Therefore, we hold the trial court erred in granting summary judgment in favor of DRMI on this issue.

**CONCLUSION**

Based on the foregoing reasons, we reverse the summary judgments in favor of DRMI on the issues of coverage and the two deductibles, and we render judgment in favor of Gemini and Berkley as a matter of law on those issues, declaring that the disputed expenses are not covered under the insurance policy and that two deductibles are warranted.  Based on our disposition of the issues concerning the Policy, we need not address the jury's findings of deceptive acts and practices and the award of damages and attorney's fees.  Accordingly, we render a take-nothing judgment against DRMI.

Rebeca C. Martinez, Justice