# Supreme Court of Texas

No. 23-0006

The Ohio Casualty Insurance Company,

*Petitioner*,

v.

Patterson-UTI Energy, Inc.; Patterson-UTI
Management Services, LLC; Patterson-UTI Drilling
Company LLC; and Marsh USA, Inc.,

*Respondents*

On Petition for Review from the
Court of Appeals for the Fourteenth District of Texas

**Argued October 30, 2024**

JUSTICE YOUNG delivered the opinion of the Court.

We must decide whether the excess-insurance policy in this case covers the insured's legal-defense expenses. Excess policies provide coverage that becomes available when an underlying insurance policy's limits have been exhausted. Logically enough, therefore, the underlying policy often features prominently in excess-coverage disputes, especially when the excess policy is a "follow-form" contract—one that can be shorter

and simpler than the underlying policy because it embraces many of the underlying policy's terms. But even for follow-form excess policies, the contract that governs a dispute about excess coverage is the *excess* policy, not the underlying policy. As in any contractual case, therefore, we begin with the excess policy's text and look to the underlying policy only to the extent that the parties consented to incorporate its terms. The court of appeals inverted this process: "We start from the ground up, first examining the terms of the [underlying] policy and then looking to the excess policy to determine coverage." 656 S.W.3d 729, 734 (Tex. App.—Houston [14th Dist.] 2022). This mistaken approach led to an erroneous result: while the underlying policy covered the insured's defense expenses, the excess policy does not. We therefore reverse the court of appeals' judgment, render judgment in part, and remand to the trial court for further proceedings.

**I**

The dispute is between Patterson (the collective name for respondents Patterson-UTI Energy, Inc.; Patterson-UTI Management Services, LLC; and Patterson-UTI Drilling Company LLC) and Ohio Casualty Insurance Company. Patterson provides oil-and-gas equipment and services. Each year, Patterson buys insurance to protect itself from costs arising from any incident that might occur during drilling operations involving its rigs. Patterson covers its risk by building an "insurance tower," which consists of a primary policy that underlies multiple layers of excess coverage. For the 2017–2018 policy year, Patterson bought several lines of insurance through its broker, respondent Marsh USA, Inc. One of those lines—the "underlying policy"

2

in this case—was an umbrella policy from Liberty Mutual Insurance Europe, Ltd. Patterson also obtained various additional excess policies through Marsh, including the one from Ohio Casualty at issue here.

A drilling-rig incident during the policy year led to multiple lawsuits, which Patterson settled after extensive litigation. The settlements and the litigation's defense expenses triggered the Ohio Casualty excess policy after exhausting the coverage limits of all lower-level policies. Ohio Casualty funded portions of the settlements but refused to indemnify Patterson for any defense expenses.

Patterson then sued Ohio Casualty and Marsh. In its live petition, Patterson alleged that Ohio Casualty's refusal breached the contract and violated the Insurance Code. In the alternative (and assuming that the excess policy did *not* cover defense expenses), Patterson alleged that Marsh violated the Insurance Code and committed negligence, negligent misrepresentation, fraud, and breach of contract by failing to procure an insurance policy that *did* cover defense expenses.

The parties filed competing motions for summary judgment regarding whether the Ohio Casualty policy covers defense expenses. The trial court granted Patterson's motion and denied Ohio Casualty's. The court determined that "the defense costs sought by [Patterson] are covered under the Ohio Casualty policy at issue in this case because the Ohio Casualty policy did not clearly and unambiguously exclude the coverage for defense costs provided by the underlying primary policy." To expedite resolution of the case, the parties jointly moved for entry of an agreed final judgment, which the trial court signed. Ohio Casualty appealed.

The court of appeals affirmed. It noted the parties' agreement that the *underlying* policy covers defense expenses. *Id.* at 734–35. The excess policy, the court then noted, is a "follow form" policy that does not unambiguously exclude defense expenses. *Id.* at 735–37. Therefore, the court reasoned, the excess policy necessarily also covers those expenses. *Id.* at 738.

We granted Ohio Casualty's petition for review and now reverse.

## II

The case turns on the construction of the excess policy—the contractual undertaking between the parties that determines what Ohio Casualty promised Patterson that it would cover.

## A

"As early as 1886, this Court recognized as 'a cardinal principle of . . . insurance law' that '[t]he policy is the contract; and if outside papers are to be imported into it, this must be done in so clear a manner as to leave no doubt of the intention of the parties.'" *ExxonMobil Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 672 S.W.3d 415, 418 (Tex. 2023) (quoting *Goddard v. E. Tex. Fire Ins. Co.*, 1 S.W. 906, 907 (Tex. 1886)). In other words, "we begin with the text of the policy at issue; we refer to extrinsic documents only if that policy clearly requires doing so; and we refer to such extrinsic documents only to the extent of the incorporation and no further." *Id.* at 418–19. We have applied this principle in the context of follow-form excess-insurance policies. *See RSUI Indem. Co. v. Lynd Co.*, 466 S.W.3d 113, 118 (Tex. 2015).

True, as we observed in *RSUI*, it is expected that a contractual

4

dispute about a follow-form excess policy will implicate the underlying policy. *See id.* at 122. The extent of that implication, however, is not a binary choice but one that presents an array of options. The excess policy could adopt the underlying policy in its entirety; it could do so except for various express exclusions; or it could substantially change the scope of initial coverage by providing its own terms. Characterizing an excess policy as a "follow-form" policy, in other words, confirms only that the excess policy will *to some degree* incorporate the provisions of the underlying policy—the degree of incorporation is determined by the excess policy's text. At all times, the excess policy itself remains the contract that governs a dispute about its coverage. The court of appeals should have first "look[ed] to the excess policy to determine coverage" rather than "first examining the terms of the [underlying] policy." 656 S.W.3d at 734.

We therefore begin with the Ohio Casualty excess policy, which supplies the following statement of coverage:

> We will pay on behalf of [Patterson] the amount of "loss" covered by this insurance in excess of the "Underlying Limits of Insurance[.]" . . . Except for the terms, conditions, definitions and exclusions of this policy, the coverage provided by this policy will follow the [underlying policy].

Patterson's legal expenses related to the drilling-rig accident are covered by this provision only if those expenses constitute "loss" because "loss" is all the excess policy agrees to cover. The excess policy defines "loss" as

> those sums actually paid in the settlement or satisfaction of a claim which [Patterson is] legally obligated to pay as damages after making proper deductions for all recoveries and salvage.

5

No one disputes that Patterson's legal expenses were "actually paid" or that Patterson was "legally obligated to pay" them in at least one sense: Patterson presumably had executed an engagement letter with its attorneys (a contract), thus obligating it to pay their fees. But to constitute "loss," the excess policy requires a different kind of legal obligation—specifically, that Patterson was legally bound to pay the amount "in the settlement or satisfaction of a claim . . . as damages."

Ohio Casualty agrees that the settlement amounts were "damages" under this definition and were thus covered as "loss." It indemnified Patterson for amounts that Patterson owed the plaintiffs through the settlements. But Ohio Casualty contends that Patterson's own legal expenses do not qualify as "loss" because they do not constitute "damages."

We agree with Ohio Casualty that the excess policy does not cover attorney's fees as "loss." Initially, as we have repeatedly held, a party's own attorney's fees "are not, and have never been, damages." *In re Corral-Lerma*, 451 S.W.3d 385, 387 (Tex. 2014) (quoting *In re Nalle Plastics Fam. Ltd. P'ship*, 406 S.W.3d 168, 173 (Tex. 2013)). But parties may give bespoke definitions to ordinary terms; if they do, the courts will enforce them. For Patterson's legal expenses to qualify as "loss," therefore, the parties must have agreed by contract to give "damages" a specialized meaning. The underlying policy, to which we will next turn, did just that by expressly providing that defense expenses were covered. The excess policy, however, does not provide any such special definition— it does not even define "damages" at all. And the context surrounding the excess policy's use of "damages" suggests the usual definition—not an expanded one that includes defense expenses—because a party paying its

6

*own* defense expenses would not do so "in the settlement or satisfaction of a claim." Accordingly, Patterson cannot satisfy its burden to establish coverage. *See Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010).

**B**

Patterson says that it largely agrees with our framework. For example, Patterson acknowledges that "Texas courts do not presume that a follow-form policy necessarily follows the entirety of the underlying policy's coverage." And it agrees that the "critical question" in this case is "what is meant by the word 'damages' when the Excess Policy uses it in its definition of 'loss.'" To show that "damages" as used in the excess policy includes legal expenses, Patterson turns to the underlying policy. Patterson's contention is that the underlying policy treats "damages" as including defense costs and that the excess policy follows that approach.

The underlying policy does not separately define "damages," but it does define "ultimate net loss," which in turn refers to damages. "Ultimate net loss" plays the same role in the underlying policy that "loss" plays in the excess policy—it is what Liberty Mutual agreed to cover. "Ultimate net loss" is defined as

> the amount [Patterson] is obligated to pay, by judgement or settlement, as damages resulting from an "Occurrence" to which this Policy applies, including the service of suit, institution of arbitration proceedings and all 'Defence Expenses' in respect of such "Occurrence."

(British English in original). The policy separately defines "defence expenses" to mean

> investigation, adjustment, appraisal, defence and appeal

7

costs and expenses and pre and post judgement interest, paid or incurred by or on behalf of [Patterson].

There is, therefore, no doubt that the *underlying* policy covers the expenses of Patterson's legal defense. Patterson contends that the excess policy follows this coverage choice. We disagree.

Initially, Patterson attributes far too much to the excess policy's "follow-form" status. Patterson agrees that the excess policy's text governs the dispute, but it retracts most of the force of that principle by treating "follow-form" policies differently from other contracts. According to Patterson, the excess policy is bound by the underlying policy's coverage choice unless the excess policy *repudiates* that choice rather than simply providing a different kind of coverage. This argument's essence amounts to the approach we emphatically reject: starting with the underlying rather than the excess policy.

Like the court of appeals, *see* 656 S.W.3d at 735, Patterson relies heavily but mistakenly on our decision in *RSUI* to justify its argument. Central to our holding there, however, was our reiteration that "[a]n insurance policy is a contract," and so we focused on the text of the policy sued on—that is to say, the excess policy. *RSUI*, 466 S.W.3d at 118. We observed that, as here, the parties there agreed that the excess policy was "a 'follow form' policy, meaning that it is generally subject to the terms and conditions of [the] primary policy except where [the excess] policy expressly modifies those terms." *Id.* at 122. That observation was entirely correct. It *described* follow-form policies in general but did not purport to adopt a new rule of construction that would treat follow-form contracts differently from all others. To the contrary, we emphasized our duty to carefully parse the words of the excess policy to determine "*how*

8

the . . . policies' limits differ[ed]." *Id.*

The coverage issue in *RSUI* was sufficiently close that even "after applying the rules of construction" to the text, we found it insolubly ambiguous as to the coverage question presented, thus requiring us to rule for the insured. *Id.* at 119, 140. But we came to that conclusion after rigorously examining all the text—the excess policy and, to the substantial extent that the excess policy adopted it, the underlying policy. *Id.* at 119–39. The excess policy here does not present any such close call.

The text of the two policies illustrates why. Rather than covering "ultimate net loss" as defined by the underlying policy (or even, as with many follow-form policies, simply agreeing to the same coverage terms as the underlying policy), the excess policy instead specifies that it covers "loss," a term for which it provides its own definition. That definition refers to "damages"—a term that, without more, does not include defense expenses. *See Corral-Lerma*, 451 S.W.3d at 387. And even if the excess policy's use of the term "damages" included defense expenses, Ohio Casualty would still have no duty to indemnify Patterson for those expenses *here*. That is because the excess policy covers only "those sums actually paid in the settlement or satisfaction of a claim which [Patterson is] legally obligated to pay as damages."

In other words, the excess policy confines its coverage to sums paid *to an adverse party*, like the personal-injury claimants who sued Patterson after the drilling-rig incident. *Cf. In re Farmers Tex. County Mut. Ins. Co.*, 621 S.W.3d 261, 270–71 (Tex. 2021) (stating that either a judgment or a settlement may trigger a duty to indemnify). Attorney's fees *could* fall within that scope. For example, if a fee-shifting statute

9

led to a judgment requiring Patterson to pay the adverse party's attorney's fees, Ohio Casualty would presumably be obligated to indemnify Patterson for that amount because Patterson would be legally obligated to pay it as part of the satisfaction of a claim. But the excess policy does not cover fees that Patterson paid *its own* attorneys.

Patterson further argues that two exclusions in the excess policy show that the policy must cover defense expenses. The policy explains that it does not apply to "[a]ny liability, including, but not limited to settlements, judgments, costs, charges, expenses, costs of investigations, *or the fees of attorneys*, experts, or consultants arising out of or related in any way, either directly or indirectly, to . . . asbestos" (emphasis added). It contains a similar statement about liability related to "pollutants." According to Patterson, these references to attorney's fees are surplusage if the excess policy does not cover those fees to begin with. It urges us to avoid surplusage by interpreting "damages" to include attorney's fees.

It is not clear that these provisions are in fact surplusage. As we have just noted, a judgment might obligate Patterson to pay an adverse party's attorney's fees. The exclusions that Patterson has identified arguably mean that, if attributable to a claim involving asbestos or pollution, Ohio Casualty would not cover even *shifted* attorney's fees. But even assuming for argument's sake that these provisions are surplusage, the surplusage canon "has its exceptions." *Whole Woman's Health v. Jackson*, 642 S.W.3d 569, 581 (Tex. 2022). "Like all canons of construction, the surplusage canon 'must be applied with judgment and discretion, and with careful regard to context.'" *Id.* at 582 (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of*

*Legal Texts* 176–77 (2012) (emphasis omitted)). And "[w]e have repeatedly recognized, when faced with legal language that appears repetitive or otherwise unnecessary, that drafters often include redundant language to illustrate or emphasize their intent." *Id.*

For example, in *Philadelphia Indemnity Insurance Co. v. White*, the tenant pointed out "an apparent redundancy" in a lease. 490 S.W.3d 468, 477 (Tex. 2016). The lease included "catchall" language providing that the tenant would be responsible for losses not caused by the landlord's negligence or fault but also specifically provided that the tenant would be responsible for particular types of damage. *Id.* We noted that "[t]hough we strive to construe contracts in a manner that avoids rendering any language superfluous, redundancies may be used for clarity, emphasis, or both." *Id.*

We conclude that the excess policy's specific references to attorney's fees in the asbestos and pollution exclusions were understandable redundancies designed to eliminate any conceivable doubt—not surplusage that would alter our interpretation of the rest of the policy. The language of the two exclusions suggests a belt-and-suspenders approach. After all, the policy could have just said that it did not apply to "any liability" arising from asbestos. Instead, it mentions "settlements, judgments, costs, charges, expenses, costs of investigations, or the fees of attorneys, experts, or consultants," and it clarifies that the exclusion is "not limited" even to that list. In its apparent determination to have nothing to do with asbestos and pollutants, the policy goes well beyond the strictly necessary language. Perhaps Ohio Casualty took that approach because it would bear the burden of proving the exclusion. *See*

11

Tex. Ins. Code § 554.002 (providing that an insurer bears the burden to show "[l]anguage of exclusion in the contract or an exception to coverage claimed by the insurer"). In any event, the care with which the asbestos and pollution exclusions were drafted should not have the perverse effect of subjecting Ohio Casualty to liability for *all other* defense expenses, even though the excess policy in no way undertakes to cover them.

Finally, Marsh, which is aligned with Patterson in this appeal, argues that Patterson must prevail unless Ohio Casualty "could establish an unambiguous exception to the coverage for defense costs found in the Underlying Policy." It cites Insurance Code § 554.002, which places the burden of establishing an exclusion on the insurer, and our decision in *RSUI*, where we explained that we construe an ambiguous contract in favor of the insured. 466 S.W.3d at 140. That argument misses the mark because, like the court of appeals' analysis, it starts with the underlying policy and then looks to the excess policy for exclusions. It does not credit the excess policy for defining its own coverage even before it presents the "follow-form" language on which Marsh relies. Because, as explained above, that coverage of "loss" does not include defense costs, Ohio Casualty need not point to an applicable exclusion from coverage.

## III

The parties stipulated in the trial court that, if the judgment for Patterson were reversed on appeal, then the judgment for Marsh must likewise be reversed so that Patterson may continue its litigation against Marsh. Parties and lower courts lack the authority to prescribe judgments on appeal, whether contingently or otherwise. Nonetheless, our rendition of judgment for Ohio Casualty does mean that the basis

for the resolution of the dispute between Patterson and Marsh has been eliminated. We therefore treat the parties' stipulation as a concession by Marsh that the judgment in its favor must also be reversed. On that basis, we reverse the court of appeals' judgment in favor of Marsh and remand that part of the case to the trial court for further proceedings.

The judgment of the court of appeals is reversed. Judgment is rendered for Ohio Casualty. We remand the dispute between Patterson and Marsh to the trial court.

_____

Evan A. Young
Justice

**OPINION DELIVERED:** December 20, 2024

13